COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                           SUPERIOR COURT DEPARTMENT
                                                       OF THE TRIAL COURT
                                                       CIVIL ACTION NO.

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>      Plaintiff<br><br>  v.<br><br>STARION ENERGY, INC.;<br>STARTELDM, LLC;<br>TELELINK, LLC;<br>TELESTARS, LLC;<br>F E Z LLC d/b/a SHORETEK;<br>RUZHDI DAUTI; and<br>DASHMIR MURTISHI<br><br>      Defendants<br><br>MASSACHUSETTS ELECTRIC COMPANY<br>d/b/a NATIONAL GRID and<br>NSTAR ELECTRIC COMPANY<br>d/b/a EVERSOURCE ENERGY<br><br>      Trustee-Defendants only | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**AFFIDAVIT OF DONALD M. BISHOP**

I, Donald M. Bishop, do hereby state and depose the following:

1.  I am an independent consultant on utility regulatory matters. I make this affidavit in support of the Commonwealth's Motion for Trustee Process and Preliminary Injunction.

- 1 -

2. I have over twenty-five years' experience working in the electric industry processing, analyzing and evaluating utility rate case petitions before public utility commissions, both as a utility rate analyst and an independent consultant. I have analyzed and reviewed utility regulatory matters and set forth recommendations in resolving issues presented. Having spent twenty-five years with Northeast Utilities Service Company and Eastern Utilities Associates Service Corporation, I am intimately familiar with electric utility operations, finance, quality control and rate setting. I hold a Master of Science in Total Quality, and a Bachelor of Arts in Economics. A summary of my qualifications and expertise can be found in Exhibit A (attached).

3. The Attorney General has engaged me to analyze billing records produced by Starion Energy, Inc. ("Starion") in response to the Attorney General's Civil Investigative Demands. I have also reviewed the transcripts of the Attorney General's deposition of Thomas Stiner, who provided testimony concerning Starion's pricing practices.

4. I make this affidavit to provide testimony on the amount of money that Starion's variable rate customers paid in excess of what they would have paid if they had received their distribution company's fixed basic service rate. I also make this affidavit to provide some background information on electricity supply services in Massachusetts.

5. In Massachusetts, residential customers who do not receive service from a competitive electric supplier, such as Starion, receive fixed basic service by default. Massachusetts electric distribution companies have separate fixed basic service rates for residential, small commercial and industrial, large commercial and industrial, and street lighting customers.

6. The electric distribution companies procure basic service through a competitive process in which each distribution company solicits and receives bids from electricity suppliers.

7. Fixed basic service for residential customers changes every six months at pre-determined times of the year.

8. The Department of Public Utilities (the "Department") reviews and approves each basic service rate before it goes into effect. The Department reviews the electric distribution companies' basic service filings to ensure that the companies have appropriately solicited and selected bids to provide basic service.

9. Basic service supply rates are pass through rates with no mark-up for profit for the electric distribution companies, meaning the companies are not allowed to make any profits from providing basic service to their customers.

10. Since the electric distribution companies do not make any profits from basic service supply rates, they do not have any interest in whether a particular customer elects to receive service from a competitive electric supplier, such as Starion, or not.

11. Electric distribution companies are required under law to provide basic service as part of their franchise obligations. Basic service serves as a pricing benchmark for determining whether a competitive electric supplier is providing a competitive rate, given the conditions of the market over that same time period.

12. I have analyzed several Excel spreadsheets provided by Starion in response to the Attorney General's Civil Investigative Demands (together, the "Billing Spreadsheets").

13. I understand that the Billing Spreadsheets were provided in response to Civil Investigative Demands seeking information concerning each bill issued to Starion's customers. The Billing Spreadsheets include information from charges in bills issued to customers starting on July 28, 2014 and include bills issued as late as July 3, 2018.

14. The Billing Spreadsheets have the following bates numbers: SEC01000003, SEC01000004, SEC01000005, AG01000000001, AG01000000002, AG01000000003, AG01000000006.

15. The Billing Spreadsheets include several categories of information as to the supply portion of the bills issued to Starion's customers. As is relevant here, the Billing Spreadsheets include, as to each bill, the name, address, customer ID and account number of each customer; the customer's utility company; the service or "cycle" start and end dates for each bill and the invoice date; the customer's supply rate with Starion; the customer's usage in kilowatt-hours ("kWh") in that month; and the customer's total charges for the month.

16. The Billing Spreadsheets also reflect that Starion charges a monthly "Account Management Fee" ("AMF") to certain of its customers in Massachusetts. The amount of Starion's AMF in the Billing Spreadsheets, if applicable, was either included as a separate column or derivable from other information.

17. Residential and small commercial and industrial customers in Massachusetts are placed on fixed basic service unless they request to receive variable basic service. I used fixed basic service prices for my analysis because the vast majority of Massachusetts residential basic service customers receive fixed basic service.

18. Starion provided the first three of the Excel spreadsheets (together, the "First Set"), representing the three service areas in which Starion sold its products, in response to the Attorney General's Civil Investigative Demand, 2015-ETD-22. The First Set includes charges in bills to Starion customers with invoice dates from July 28, 2014 through June 11, 2015.

19. In response to the Attorney General's next Civil Investigative Demand to Starion, 2017-ETD-08, Starion supplemented its production with three additional spreadsheets (together,

the "Second Set"). The Second Set includes charges in bills to customers in each service area with invoice dates from June 1, 2015 through April 1, 2017.

20. The information provided in the Second Set has some differences from the First Set. For example, whereas the First Set contains a column titled "Rate Plan" which shows whether the customer was on a fixed or variable rate plan, the Second Set does not contain this column.

21. Starion also provided an additional supplement (the "Third Set"), including bills to customers in each service area with charges in bills to customers with invoice dates from March 1, 2017 through July 3, 2018. Unlike the First and Second Sets, the Third Set contains billing data from all of the service areas in which Starion does business in Massachusetts in a single .txt file which is viewable as a spreadsheet in Excel.

22. There are also other differences in the Third Set, compared with the First and Second Set. For example, whereas the First and Second Sets contain a column for the monthly AMF, the Third Set does not have this column. However, the "Total Charges" column in the Third Set includes charges related to the rate per kWh, the AMF, and sales tax, where applicable. I understand that Starion has also represented that the Third Set is a raw data download from its electronic data interchange ("EDI") provider, and therefore may not be completely accurate with respect to the "Rate Class Code" and may contain other anomalies.

23. The Billing Spreadsheets indicate that Starion had approximately 130,600 customers combined in the three sets. Of these, I estimate 117,700 were variable rate customers and 12,900 were fixed rate customers.

24. The Billing Spreadsheets also reflect that Starion marketed in the service territory of Massachusetts Electric Company d/b/a National Grid ("National Grid") and the service

territory of NSTAR Electric Company d/b/a Eversource Energy ("NSTAR") and Western Massachusetts Electric Company d/b/a Eversource Energy ("WMECo"). As of December 29, 2017, WMECo merged into NSTAR. I will refer to them together in this affidavit as "Eversource," and individually as "NSTAR" and "WMECo."

25. Based on the deposition testimony of Mr. Stiner, as well as my analysis of the Billing Spreadsheets, Starion sells three different electricity supply products in Massachusetts: a monthly variable rate product, known as "Starion Simple"; a fixed rate product, known as "Starion Secure"; and a fixed rate product that includes voluntary renewable energy certificates, known as "EcoGreen Secure." My analysis here focuses only on the rates Starion charged to its Starion Simple variable rate customers.

26. Due to the differences between the types of information included in the First, Second, and Third Sets that Starion produced, I had to make certain estimates or assumptions when determining which losses are associated with Starion's variable rate customers and which losses are associated with Starion's fixed rate customers.

27. For the First Set, I populated each row in the spreadsheet (which itself represents an individual bill) with the fixed basic service rate that was effective in each customer's service area for residential customers at the time of the customer's invoice date for the applicable bill. After populating the First Set with the applicable basic service rate, I compared the rate charged by Starion, as reflected in the First Set, to the rate that the customer would have paid if the customer had been on his or her utility's fixed basic service rate.

28. The comparison was achieved by subtracting the utility's fixed basic service rate from Starion's billed rate for each bill in the First Set. This calculation resulted in either a positive or a negative number, depending on whether Starion's billed rate was above or below

the basic service rate. That number, for each bill, was then multiplied by the customer's usage for the particular month to come up with an amount for each bill representing a savings or overcharge relative to the basic service rate. I term the sum of these numbers the "Net Variable Overcharge."

29. In addition to analyzing the amount Starion charged its Starion Simple variable rate customers in relation to the utility's fixed basic service rate, I also analyzed the amount that customers paid in monthly AMFs. For the First Set, I calculated this by adding the amounts in the AMF column for Starion Simple variable rate customers to determine the total amount of money these customers paid in AMFs.

30. I included the AMFs in my analysis because basic service customers do not pay any separate fixed charges for electricity supply—they pay only the product of the basic service rate and their monthly consumption. In short, the AMFs are charges that Starion's customers would not have paid if they had received basic service electricity from their electric distribution companies, and thus are properly included in the total amount of overcharges relative to basic service.

31. In reviewing the First Set, I noticed the following ratio of variable bills to total number of bills in the file: 0.9098 for National Grid; 0.9626 for NSTAR; and 0.9437 for WMECo. These ratios were calculated by simply dividing the total number of bills for Starion Simple variable rate customers by the total number of bills for all of Starion's customers.

32. For the Second Set, I followed essentially the same process as I did when I analyzed the First Set: I compared the amount of money customers paid to Starion versus the amount they would have paid had they paid their utilities' fixed basic service rate. However,

because the Second Set did not include information regarding the "Rate Plan" each customer was on, I had to estimate the number of customers on the Starion Simple variable rate plan.

33. To estimate that number, I used the ratios of Starion Simple variable bills to total number of bills in the file from the First Set, as identified above. After subtracting the utility's fixed basic service rate for the particular month from the rate charged by Starion, and multiplying that number by the customers' electricity usage, the result was either a positive or negative number, representing an overcharge or undercharge relative to basic service for each bill. I summed the over/undercharge numbers for each utility, and I multiplied the resulting totals for each by the appropriate ratio to come up with the Net Variable Overcharges number for the Second Set.

34. To calculate the overcharges relating to the monthly AMF Starion charged to Starion Simple variable rate customers in the Second Set, I simply summed all of the fees listed in the AMF column and multiplied that number by the same ratios used for calculating the Net Variable Overcharges.

35. Regarding the Third Set, I followed a similar process to calculate the amount of overcharges as I used in calculating the Second Set. After subtracting the utility's fixed basic service rate for the particular month from the rate charged by Starion, and multiplying the number by the customers' electricity usage, the result was either a positive or negative number, representing an overcharge or undercharge relative to basic service for each bill. Because there was no column indicating the type of rate each customer was on, and the Rate Class Code column was unreliable, I had to again estimate the number of people on the Starion Simple variable rate plan. I summed the over/undercharge numbers for each utility, and multiplied the

resulting totals for each by the appropriate ratio to come up with the Net Variable Overcharges number for the Third Set.

36. The Third Set did not include a dedicated column for the monthly AMF, but I was able to derive the amount of these fees, to the extent they were present, for each bill from other information in the spreadsheet. The AMF was only present for National Grid and NSTAR customers, and amounted to $6.72 per month in most cases.

37. To calculate the total amount of overcharges related to the monthly AMF, I first multiplied the "Billable Usage" by the "Billed Rate." I then subtracted this amount from the "Total Charges" and added all of these amounts up to get the total amount of fees. Lastly, I added up the amounts in the "Sales Tax" column and subtracted that total from the total fees amount, resulting in the AMF total reported below.

38. The results of my analysis of Starion's Billing Spreadsheets are summarized in the table below:

| File name | Net Variable Overcharges | Account Management Fees | Subtotal/ Total |
| --- | --- | --- | --- |
| **First Set** | | | |
| National Grid - MA Through 6_10_2015 (2).xlsx (SEC01000003) | ($1,121,608.32) | $814,060.10 | ($307,548.22) |
| NSTAR Invoices Through 6_11_2015 (2).xlsx (SEC01000004) | ($207,008.17) | $144,406.88 | ($62,601.29) |
| WMECO Invoices Through 6_11_15.xlsx (SEC01000005) | $310,028.28 | 0.00* | $310,028.28 |
| **Subtotal** | ($1,018,588.21) | $958,466.98 | ($60,121.23) |
| | | | |
| **Second Set** | | | |
| National Grid - MA Invoices 6_1_2015 to 04_01_2017 - Final.xlsx (AG01000000001) | $7,529,704.93 | $2,702,153.36 | $10,231,858.29 |
| NSTAR Invoices 6_1_2015 to 4_1_2017 - FInal.xlsx (AG01000000002) | $3,286,323.45 | $1,555,870.86 | $4,842,194.31 |
| WMECO Invoices 6_1_2015 to 04_01_2017 - Final.xlsx (AG01000000003) | $3,119,976.19 | 0.00* | $3,119,976.19 |
| **Subtotal** | $13,936,004.57 | $4,258,024.22 | $18,194,028.79 |

|  |  |  |  |
|---|---|---|---|
| **Third Set** – BillingSummary_7_5_18.txt (AG01000000006) |  |  |  |
| National Grid - MA Invoices | $5,470,121.74 | $1,720,840.64 | $7,190,962.38 |
| NSTAR Invoices | $2,105,082.27 | $1,472,779.57 | $3,577,861.84 |
| WMECO Invoices | $1,720,180.38 | 0.00* | $1,720,180.38 |
| **Subtotal** | $9,295,384.39 | $3,193,620.21 | $12,489,004.60 |
|  |  |  |  |
| **Total** | **$22,212,800.75** | **$8,410,111.41** | **$30,622,912.16** |

\* There were no fees listed/calculated for WMECo.

39.     In total, based on my calculations as explained above, the Billing Spreadsheets reflect that Starion's Starion Simple variable rate customers paid approximately $30.6 million more than they would have paid on their utility's fixed basic service rate for electricity used during the period from July 2014 through July 2018.

40.     On average, Starion Simple variable rate customers paid higher supply rates than if they had been on their local utility's fixed basic service rate.

41.     I also estimated, based on the Billing Spreadsheets, that Starion had 117,700 unique Starion Simple variable rate customers from July 2014 to July 2018. Because the Second and Third Sets did not provide sufficient information to determine who was a variable rate customer, I used the following ratios of variable to total customers from the First Set to estimate the number of Starion Simple variable rate customers: 0.8706 for National Grid; 0.9436 for NSTAR; and 0.9085 for WMECo.

42.     The First Set also contains a column entitled "Vendor" which appears to indicate the marketing channel through which each customer signed up with Starion. The percentage of

bills for which the vendor is listed as "Startel" varies for each company according to the following percentages: 92.12% for National Grid; 98.92% for NSTAR; and 43.12% for WMECo. The Second and Third Sets do not include the "Vendor" column.

43. Although Starion's rates are significantly higher than fixed basic service, the Billing Spreadsheets reflect that many customers have not cancelled and returned to basic service or chosen another supplier.

44. It is well known in the utility industry that most electricity customers only pay attention to their total bill. Accordingly, a customer who receives high charges for supply may not notice because the change could be masked by lower consumption or reductions in other charges on the bill.

45. Additionally, a customer would not be able to tell simply from looking at his or her bill that Starion had charged him or her more for electricity supply as compared to the previous month or compared to the utility's basic service price. Bills from Massachusetts electric distribution companies only include the charges from the customer's supplier on the bill. Thus, a Starion customer would see Starion's rate on his or her electricity bill, but could not determine if that rate was higher or lower than basic service simply by reviewing his or her bill. A well-educated customer could certainly discover the current basic service rates by contacting his or her electric distribution company or finding the information on the Internet. However, based on my experience working in the industry, customers typically do not pay this much attention to charges on their electricity bill.

Signed under the pains and penalties of perjury this 12TH day of October, 2018.

_____
Donald M. Bishop

**Donald M. Bishop**                                                      **Appendix A – Page 1 of 2**

## EXPERIENCE

**Consultant (2013 – Present)**
Experienced in processing, analyzing and evaluating utility rate case petitions before Public Service Commissions. Examines and evaluates rate filings, contracts, agreements and rate matters regarding utility operations and provides recommendations as to best course of action.

Analyzes and reviews utility regulatory matters and sets forth recommendations in resolving the issues. Calculates total revenue requirement needed to cover operating expenses and rate of return.

Researches and evaluates regulatory utility matters to assess impact on various classes of customers, regarding rates, service, compliance and cost of service provisions.

**NORTHEAST UTILITIES SERVICE COMPANY**
**Manager, Massachusetts Regulatory Policy** (2001 - 2012)
Led the team that resulted in the successful approval of a $16.8M distribution rate increase and a revenue decoupling mechanism for Western Massachusetts Electric Company.

Led the team that received approval for the first investor-owned utility solar generation program in Massachusetts.

Participated on teams that led to the successful approval of two two-year rate settlements for Western Massachusetts Electric Company that increased distribution revenues by more than $24M.

Integrated financial and policy-driven goals into a comprehensive regulatory strategy.

Developed the policies necessary to implement this strategy.

Secured regulatory approval of company policies and filings.

Testified in Massachusetts regulatory proceedings.

**Senior Regulatory Planning Analyst** (1999 – 2001)
Participated in the development and implementation of regulatory policy related to Massachusetts' proceedings.

Responsible for the planning, scheduling, and coordination of various regulatory filings including the preparation of testimony in support of implementing that policy.

Monitored regulatory activities of other utilities.

Coordinated administrative matters and interaction with regulatory commission staff and intervenors.

Testified in Massachusetts regulatory proceedings.

Served as an examiner for the Pioneer Valley Business Excellence Award.

**EUA SERVICE CORPORATION**
**Regulatory Assistant** (1988 – 1999)
Participated on the team that developed a revenue recovery mechanism that increased EUA retail affiliate profits by more than $1M per year.

Led and participated on teams addressing a broad spectrum of technical problems/issues.

Responded to ad hoc requests for analyses and/or information.

Performed economic analyses of various business options.

Researched and wrote position papers on technical issues.

Guided regulatory projects.

Prepared testimony and regulatory filings.

Testified as an expert witness before regulatory commissions.

<u>**Donald M. Bishop**</u>                                                        <u>**Appendix A – Page 2 of 2**</u>

Served as an examiner for the Massachusetts Quality Award.

**Rate Analyst** (1987 – 1988)
Responsible for the study, analysis, and design of rates in the Rate Research Section.

Conducted research into new ratemaking procedures, innovative rate designs and improved data acquisition.

Prepared testimony and exhibits for use before State Regulatory Agencies in support of periodic fuel and purchased power adjustment factor and rate case proceedings.

Testified as an expert witness before the Massachusetts Department of Public Utilities and the Rhode Island Public Utilities Commission.

**MASSACHUSETTS WATER RESOURCES AUTHORITY**
**Statistician, Transmission Section** (1986 – 1987)
Performed hydraulic flow calculations/analyses for reservoir and aqueduct monitoring including flood control, discharges, and water supply to municipalities, flow release and diversions. Responsible for the section's record maintenance.

Initiated the automation of office procedures and reports on microcomputer.

**Computer Systems Consultant** (1985 – 1989)
Reviewed clients' computer needs and recommended the appropriate microcomputer solution; demonstrated computer hardware and software; performed system installation and customer training.

Taught "Getting Acquainted with Microcomputers" and "Programming in the Basic Language" courses at Keefe Tech Vocational School.

**MASSACHUSETTS DEPARTMENT OF PUBLIC UTILITIES**
**Rate Analyst** (1981 – 1985)
Assisted in Department investigations and proceedings in the areas of revenue allocation and rate design.

Prepared interrogatories, cross-examined company witnesses, and drafted Department decisions.

Reviewed gas companies' supply data.

Handled technical inquiries, consumer complaints, and explained Department regulations and policies.

**Project Liaison** (1980 – 1981)
Responsible for the daily oversight of federally funded project, Rate Incentives for Utility Efficiency, including the compliance and implementation of the federal PURPA standards pertaining to this project.

Prepared project financial, progress and final reports for federal review.

### EDUCATION

Master of Science in Total Quality, Anna Maria College

Bachelor of Arts in Economics, University of Massachusetts at Amherst

Certificate in Marketing, Framingham State College

### TECHNICAL DEVELOPMENT

National Economic Research Associates Marginal Costing for Electric Utilities Course

Edison Electric Institute Rate Fundamentals Course